ADRIAN HERNANDEZ *VS.* SUZANNE BRANCIFORTE.

No. 99-P-2202.

Worcester. January 18, 2002. - June 14, 2002.

Present: GREENBERG, KAFKER, & COHEN, JJ.

*Probate Court,* Jurisdiction. *Massachusetts Child Custody Jurisdiction Act. Divorce and Separation,* Jurisdiction, Child custody, Modification of judgment, Sanctions, Attorney's fees. *Minor,* Visitation rights, Custody. *Contempt.*

A Probate Court in Massachusetts had subject matter jurisdiction to entertain a father's custody modification complaint, where the record clearly demonstrated that the judge made findings in accord with those required under G. L. c. 209B, § 2(*a*)(4), to the effect that courts in Italy essentially acted to maintain the status quo, allowing the child to remain in Italy and otherwise declining jurisdiction until the probate judge in Massachusetts could issue a final decision, and that assumption of jurisdiction was in the best interests of the child, given the child's and father's significant connection with Massachusetts and the availability in Massachusetts of substantial evidence concerning the child's present or future care, protection, training, and personal relationships. [216-218]

A probate judge did not err in requiring a mother to file a petition for removal of her child from Massachusetts, where the permanent removal of the child from Massachusetts without both parents' consent or a finding of good cause was unlawful under G. L. c. 208, § 30. [218-219]

In a proceeding for modification of child custody, the judge properly concluded that the mother's failure to obtain leave to remove the child from Massachusetts, combined with a breakdown in communication between the mother and the father and the mother's failure to place the welfare of her child above her own, justified a modification in custody, not as punishment, but because the mother did not act in the best interests of her child. [219-221]

In a proceeding for modification of child custody, the judge did not abuse her discretion in finding the mother in contempt given a stipulation and separation agreement that were sufficient to apprise the mother of her obligation to facilitate the child's visitation with his father, which she failed to do, along with numerous dilatory and vexatious actions on the part of the mother and her several lawyers (jointly and separately) and their apparent flouting of court orders. [221-222]

In a proceeding for modification of child custody, the judge did not abuse her discretion in awarding financial sanctions against the child's mother and only partial attorney's fees to the father's attorney. [222-223]

COMPLAINT for divorce filed in the Worcester Division of the Probate and Family Court Department on July 18, 1995.

Proceedings for contempt, modification of custody and visitation, sanctions, and removal were heard by *Susan D. Ricci*, J.

*Peter M. Barlow* for the defendant.

*Edwin C. Hamada* for the plaintiff.

GREENBERG, J. On October 16, 1997, a judge of the Probate and Family Court granted the defendant, Suzanne Branciforte (mother), a judgment of divorce nisi from the plaintiff, Adrian Hernandez (father), because of an irretrievable breakdown of the marriage. See G. L. c. 208, § 1B. Previously, the parties had entered into a separation agreement that provided that it would survive the judgment of divorce except for those provisions relating to their son, Maximillian, who was four years old at the time. We deal here with a dispute that subsequently arose over custody and visitation when the mother sought to move permanently with Maximillian to Italy.

1. *The dispute.* Prior to the divorce, on August 5, 1997, the parties entered into a stipulation that allowed the mother to take Maximillian with her to Italy from September 1, 1997, until October 10, 1997. Both left for Italy and stayed there before returning to the United States for the divorce hearing on October 16, 1997. The separation agreement, also executed on October 16, 1997, detailed only Christmas visits for the father through the remainder of 1997. As part of the divorce, the mother again obtained the father's consent and the court's approval to return with Maximillian to Italy from October, 1997, until August 31, 1998. For this period, the stipulation, as incorporated by reference into the separation agreement, outlined a temporary schedule for the father to visit Maximillian.

In March, 1998, the father filed a contempt complaint, claiming that the mother had refused two of the agreed-upon visits. In July, 1998, the father filed a complaint seeking modification of the judgment, specifically, the merged separation agreement provisions granting the mother physical custody of Maximillian and establishing the visitation schedule. As grounds for modification, he claimed that she intended to reside permanently in Italy with Maximillian, contrary to his understanding in signing the separation agreement and the stipulation, and was mak-

ing unreasonable demands for him to accommodate her unilateral decision.

In an affidavit, the mother responded that the separation agreement did not restrict her choice of residence and contemplated only good faith negotiation about visitation for the period subsequent to August 31, 1998. In this regard, she stated that the father had violated the separation agreement by filing the complaint for modification without first attempting to negotiate a future visitation schedule. Her position was that the parties were to agree to a new schedule after August 31 (with no change in physical custody) and return to the Probate Court only if they reached an impasse. In subsequent proceedings, she asserted that, having lost her position as professor of Italian literature at the College of the Holy Cross in Worcester, her prospects of securing another appointment in the United States were slim. Because she felt her career opportunities were stronger in Italy, she wanted to remain there with Maximillian for the indefinite future.

On August 3, 1998, the parties appeared before a Probate Court judge. There followed a flurry of pretrial motions, which resulted in the appointment of a guardian ad litem for Maximillian; an order that the mother either file a petition for his removal to Italy, pursuant to G. L. c. 208, § 30, or be deemed to have waived such a request; an order allowing the mother to take Maximillian to Italy temporarily, on condition of their return for the scheduled, consolidated trial on the father's complaint for modification, his contempt actions, and the mother's removal petition; and an order requiring her to post a surety bond as a condition precedent to Maximillian's temporary removal and to ensure his return for the trial. These court orders were made just before August 31, 1998, the date through which the parties' visitation agreement applied.

Although by August 31, 1998, the mother had obtained the judge's permission to take Maximillian to Italy temporarily, upon her arrival there, it became evident that she had no intention of returning. After the father obtained a temporary custody order from a second Probate Court judge on October 2, 1998, the mother attempted to have the Juvenile Court in Genoa, Italy, assume jurisdiction. The latter court, on October 8, 1998, and in

subsequent rulings, essentially acted to maintain the status quo, allowing the child to remain in Italy and otherwise declining jurisdiction, pending resolution of the instant litigation in Massachusetts.[1] The mother refused to comply with several Probate Court discovery orders (leading to the father's second complaint for contempt), and, when the cases came on for the scheduled trial on October 27 and November 2, 1998, she refused to appear or produce Maximillian for purposes of deposition or trial.

Later, in the fall of 1998 and winter of early 1999, the same judge who had monitored pretrial proceedings on August 3, 1998 (referred to hereafter as "the judge"), now held evidentiary hearings on seven intermittent days, and issued extensive findings of fact and rulings of law. Notwithstanding the mother's absence, her counsel mounted a prodigious defense. On her behalf, counsel presented an expert witness to counter the

---

[1]We recount the course of the Italian proceedings, as presented in the materials accompanying the mother's motion to supplement the record on appeal, which we granted at oral argument. See *Mannor* v. *Mannor*, 46 Mass. App. Ct. 46, 47 n.7 (1998).

On October 8, 1998, in response to her petition, the Juvenile Court of Genoa ordered Maximillian "given to the mother . . . so that he be kept with her until a definitive decision of the American Judicial Authority." Subsequently, in November 1998, the father filed a petition, also in the Juvenile Court of Genoa, to obtain physical custody of Maximillian "in accordance with the Convention of Aja," i.e., the Hague Convention on the Civil Aspects of International Child Abduction. In two decisions, issued in February and April, 1999, the Juvenile Court of Genoa "provided for the return of the boy to his father" (see note 6, *infra*). The Italian Supreme Court reversed and remanded these decisions in March 28, 2000.

In a September 29, 2000, decision, the Juvenile Court of Genoa addressed the Italian proceedings on remand. At that time, the court recognized that it had originally assumed that Maximillian's presence in Italy was justified by the separation agreement, and noted that its current judgment was made "after the factual and judicial situation has radically changed, since the minor has again been sent to his father by force of [its rulings in February and April, 1999,] and with the intervention which occurred with the American authorities' modifying decision regarding the custody and care established in the divorce." The court also clarified the mistakes in its earlier, February, 1999, decision, as found by the Italian Supreme Court.

Ultimately, the Genoa court on September 29, 2000, dismissed the father's petition, concluding the proceedings in Italy. In light of our decision on jurisdiction under G. L. c. 209B, see discussion *infra*, we do not address any Hague Convention issues.

adverse recommendation of the guardian ad litem. Counsel's cross-examination of the father and the guardian ad litem also required five additional days beyond the two days that the judge originally had allotted for the case.

On the father's two complaints for contempt, the judge found the mother in contempt for failing to make Maximillian available for a February, 1998, school vacation visit, and her wilful failure to comply with several court orders. Specifically, the mother had not complied with the discovery orders, had failed to appear for a scheduled deposition, and had failed to return to Massachusetts with Maximillian for the consolidated trial. On the complaint for modification, the judge awarded sole physical custody to the father, granted the mother reasonable, supervised visits in Massachusetts, directed the first justice of the Worcester Probate and Family Court to hold Maximillian's passport, and ordered the mother to pay fifty dollars weekly for child support. She also terminated the father's child support payment obligation after January 26, 1999. Finally, the judge assessed the mother $35,000 to cover half of the father's counsel fees.

2. *Claimed lack of jurisdiction.* The mother first challenges the Probate Court's subject matter jurisdiction to entertain the father's custody modification complaint. She argues that, in July, 1998, when the father filed that complaint, Italy, rather than Massachusetts, had "home state" jurisdiction under G. L. c. 209B. Regardless of whether the mother is correct that Italy had become Maximillian's "home state," the Probate Court did not err in taking jurisdiction, under provisions of G. L. c. 209B not requiring that Massachusetts be the child's "home state."

The Massachusetts Child Custody Jurisdiction Act, G. L. c. 209B, governs any proceeding in which a custody dispute is presented for resolution. See *MacDougall* v. *Acres*, 427 Mass. 363, 366 (1998), and cases cited. See also *Umina* v. *Malbica*, 27 Mass. App. Ct. 351, 358 (1989), where we held that the statute treats "modification proceedings as distinct from initial ones." Cf. *Rosenthal* v. *Maney*, 51 Mass. App. Ct. 257, 261 (2001) ("a request for modification of custody is distinct from a request to relocate and must be based on a material and substantial change in circumstances other than the move").

Under G. L. c. 209B, a court must determine whether it has the power to exercise jurisdiction in a custody proceeding and, if so, whether it should exercise that power. *Custody of Brandon,* 407 Mass. 1, 5-6 (1990).

The portion of G. L. c. 209B on which the judge relied in her memorandum of decision is § 2(*a*)(4), which vests jurisdiction in any court where "(i) it appears that . . . another state has declined to exercise jurisdiction on the ground that the commonwealth is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that a court of the commonwealth assume jurisdiction." Contrary to the mother's assertion, jurisdiction under § 2(*a*)(4) does not rest on Massachusetts, rather than Italy, being Maximillian's "home state."[2]

The mother counters that, in July, 1998, when the father filed his modification complaint, the Italian courts were willing to adjudicate the custody issue and, in fact, later exercised jurisdiction in this matter.[3] We reject this assertion; the Probate Court correctly concluded that the Italian courts essentially acted to maintain the status quo, allowing the child to remain in Italy and otherwise declining jurisdiction until the Massachusetts Probate Court could issue a final decision.[4]

As for the mother's argument that "the Probate Court utterly

---

[2]Although we need not and do not decide the issue, we are doubtful that Italy could have been Maximillian's "home state" because there was no consent or court permission for his permanent removal from Massachusetts, as required by G. L. c. 208, § 30. In fact, as the judge found, had the father known that the mother intended to permanently remain in Italy, "he would not have agreed to allow Maximillian to move there even on a temporary basis."

[3]It would appear that in appropriate circumstances, such as those delineated in G. L. c. 209B, §§ 2(*d*), 2(*e*), and 14, Massachusetts courts may defer to custody proceedings in a foreign country. See *Custody of a Minor (No. 3),* 392 Mass. 728, 731 (1984); *Bak* v. *Bak,* 24 Mass. App. Ct. 608, 615 n.8 (1987); *Tazziz* v. *Tazziz,* 26 Mass. App. Ct. 809, 814-815 & n.6 (1988).

[4]To the extent the mother argues that jurisdiction in the Probate Court could not have existed prior to any action by the Italian courts, we disagree. Even assuming Massachusetts had lost "home state" jurisdiction, under G. L. c. 209B, § 2(*a*)(1)(ii), Massachusetts had jurisdiction because it *"had been* the child's home state within six months before the date of the commencement of the [modification] proceeding," the child was being retained in Italy "by a person [the mother] claiming his . . . custody or for other reasons," and the father continued to reside here. In the circumstances, we discern no

failed to make the other necessary determination under [G. L.] c. 209B, § 2(*a*)(4), . . . that assumption of jurisdiction is in the best interest of the child," that contention also has no merit. On the basis of the father's testimony, and that of the guardian ad litem and his investigative report, the judge accepted the notion that "it would not be in [Maximillian's] best interest to be removed from the Commonwealth, and . . . physical custody should be with the father."

To support this conclusion, the judge made subsidiary findings, too numerous to repeat here, to the effect that all of Maximillian's paternal relatives reside in Massachusetts, that the father has demonstrated parenting skills, and that he has been "an involved, loving and nurturing parent throughout the child's life." See *Redding* v. *Redding*, 398 Mass. 102, 106 (1986) ("Although G. L. c. 209B, § 2[*a*][4], does not set forth considerations relevant to whether the court's assumption of jurisdiction is in the best interest of the child, § 2[*a*][2] does. The child and at least one parent must have 'significant connection' with the Commonwealth, and 'substantial evidence concerning the child's present or future care, protection, training, and personal relationships' must be available here"). The record in this case clearly demonstrates that the judge made findings in accord with those required under G. L. c. 209B, § 2(*a*)(4).

3. *The removal petition.* The mother contends that the judge erred by requiring her to file a petition for removal in August, 1998, because the parties' separation agreement had established a visitation schedule through August 31, 1998, and had reflected that the mother and Maximillian already lived in Italy. By claiming that the agreement was unambiguous in that respect, she

---

lack of authority or abuse of discretion in the Probate Court's taking jurisdiction prior to the mother's petitioning of the Italian courts.

We take this occasion to point out that the mother has done little to explain what considerations lead her to conclude that Massachusetts either should have declined jurisdiction, or was prohibited from taking jurisdiction, under G. L. c. 209B, §§ 2(*d*), 2(*e*), 7(*a*), and 7(*d*). See *Custody of a Minor (No. 3)*, 392 Mass. 728, 733-734 (1984); *Custody of Brandon*, 407 Mass. at 7-13; *Guardianship of Zeke*, 422 Mass. 438, 445 (1996); *Bak* v. *Bak*, 24 Mass. App. Ct. 608, 615-616 (1987); *Tazziz* v. *Tazziz*, 26 Mass. App. Ct. 809, 815 (1988); *Umina* v. *Malbica*, 27 Mass. App. Ct. at 355; *Giambrone* v. *Giambrone*, 32 Mass. App. Ct. 118, 129 (1992); *Orchard* v. *Orchard*, 43 Mass. App. Ct. 775, 780 (1997).

argues that, by signing the agreement, the father had implicitly agreed to Maximillian's removal and had waived his right to object. There is another fundamental flaw with this argument, beyond those that we have already mentioned concerning the mother's failure to inform the father or the court of her intent to move permanently to Italy with Maximillian. Although the separation agreement specified that it should not be merged into the divorce judgment, but should survive and have independent legal significance, see *Surabian* v. *Surabian*, 362 Mass. 342, 345-346 (1972), the agreement excepted from that specification all provisions relating to the minor child, which did merge into the judgment. Thus, we note — as did the judge below — that the permanent removal of Maximillian from the Commonwealth without both parents' consent or a finding of good cause was unlawful under G. L. c. 208, § 30.[5] See *Yannas* v. *Frondistou-Yannas*, 395 Mass. 704, 710-712 (1985). On this point, the mother merely repeats the same meritless arguments: that she had disclosed that she was making a permanent move to Italy, and that the judge's approval of the separation agreement, in and of itself, constituted approval of her removal of the child to Italy.

4. *The modification of custody.* The mother contends that the judge based her decision to grant physical custody of Maximillian to the father on impermissible factors. She relies on *Hersey* v. *Hersey*, 271 Mass. 545 (1930), and claims that the principal basis for the judge's modification decision was the mother's flagrant violation of the court's authority by refusing to return from Italy for trial.

While it is true that the judge concluded that the mother flouted pretrial orders and had no intention of returning to Massachusetts after leaving in fall 1998, nothing in the record

[5]Until well after the divorce, when she filed her August, 1998, petition under G. L. c. 208, § 30, the mother apparently did not contemplate that she needed the father's permission for "removal" of Maximillian from the Commonwealth, as that term is used in G. L. c. 208, § 30. The parties' separation agreement also did not deal with the subject. Contrast *Williams* v. *Pitney*, 409 Mass. 449, 452-455 (1991), where a surviving separation agreement contained a provision prohibiting removal without the nonremoving spouse's consent, and the Supreme Judicial Court applied the removal standard in G. L. c. 208, § 30, rather than the usual standard in judging separation agreements.

indicates that the judge viewed the modification proceeding as a way "to discipline the [mother] for her shortcomings." *Id.* at 555. The judge instead dealt with that issue by means of the monetary sanctions that we discuss in part 6 of our opinion. The judge recognized that a transfer of custody from one parent to another must be based on some material and substantial change in circumstances since the divorce, see *Rosenberg* v. *Merida*, 428 Mass. 182, 191 (1998), and that the change must be of sufficient magnitude to satisfy the governing principle, namely, whether the transfer is in the best interests of the child. See *Delmolino* v. *Nance*, 14 Mass. App. Ct. 209, 211 (1982).

The judge concluded that the mother's performance as the custodial parent demonstrated that she was not capable of separating her needs and interests from those of Maximillian. That she chose to make a unilateral move, and failed to consider that "it is in [Maximillian's] best interest to have a meaningful relationship with both of his parents," was the judge's major point. She correctly emphasized that a custodial parent's removal of the child from Massachusetts, without the other parent's consent, is alone insufficient to warrant modification of the custody order. See *Haas* v. *Puchalski*, 9 Mass. App. Ct. 555, 557 (1980).

The judge rested on other factors as contributing to a material and substantial change in the circumstances. See *Stevens* v. *Stevens*, 337 Mass. 625, 627 (1958) (independently of father's unlawful conduct in removing daughter from Massachusetts, there was relevant, significant change in circumstances with mother's new home and marriage sufficient to warrant change in custody). See also *Aufiero* v. *Aufiero*, 332 Mass. 149, 154 (1955) (although mother unlawfully removed child from custody of father's parents in New York, material change in circumstances had occurred since father's Nevada divorce decree sufficient to warrant change in custody to mother). The relevant findings made by the judge, all of which have solid support in the record, include the abject breakdown in communication between the parties, which the judge was justified in ascribing to the mother's defiance. See *Rosenberg* v. *Merida*, 428 Mass. at 191. Cf. *Rolde* v. *Rolde*, 12 Mass. App. Ct. 398, 404-405 (1981) (discussing need for respect and ability to work together

in context of joint legal custody). The judge also noted that a change in custody would disrupt Maximillian's living environment in Italy and any relationships that he had formed there, but concluded that the mother had compromised his relationship with his father and his extended paternal family in the United States. She considered the interests of the custodial parent, the noncustodial parent, and the child in reaching her decision. Of some import was the testimony and report of the guardian ad litem, who recommended that the change in physical custody was in Maximillian's best interest. The judge's additional findings concerning the father's parenting skills, close relationship with his son, and the preparations that he had made to enroll Maximillian in school upon his return from Italy need not be repeated. We are satisfied that the judge considered all relevant factors in weighing the best interests of Maximillian with respect to physical custody. See *Bouchard* v. *Bouchard*, 12 Mass. App. Ct. 899, 899 (1981).

At the time of the consolidated trial, the possibility still remained that the mother might have been able to obtain leave to remove Maximillian to Italy, under G. L. c. 208, § 30, see *Yannas* v. *Frondistou-Yannas*, 395 Mass. at 710-712, had she attended with Maximillian. See *Rosenthal* v. *Maney*, 51 Mass. App. Ct. at 261 ("a request for modification of custody is distinct from a request to relocate and must be based on a material and substantial change in circumstances other than the move"). Nonetheless, she did not do so, and that failure, combined with the breakdown in communication between the parties and the mother's failure to place the welfare of her son above her own, justified this result, not as punishment, but, as the judge indicated, because the mother did not act in the best interests of her son.[6] See *Murphy* v. *Murphy*, 380 Mass. 454, 462 (1980) ("The misconduct of the parent may, nevertheless, adversely affect the welfare of the child").

5. *Contempt.* The mother challenges the judge's findings holding her in contempt for not providing the father with a February, 1998, visit, as per the separation agreement; her

---

[6]We are informed by the mother's brief that the father traveled to Italy in early 1999 to transport Maximillian back to Massachusetts. The mother apparently has not seen Maximillian since April 1, 1999.

failure to appear, as ordered, for pretrial depositions on two different occasions in the fall of 1998; her unwillingness to complete discovery prior to trial; and her noncompliance with the order to return with Maximillian for the scheduled trial on October 27, 1998.

To support a finding of civil contempt, there must be a clear and unequivocal command and an equally clear and undoubted disobedience. *Nickerson* v. *Dowd*, 342 Mass. 462, 464 (1961); *Diver* v. *Diver*, 402 Mass. 599, 602-603 (1988). Although the stipulation and separation agreement dealing with visitation are not models of clarity, we think that they were sufficient to apprise the mother of her obligation to facilitate visitation during the father's February vacation from his teaching position. This she failed to do, and she does not challenge the judge's decision to construe any ambiguities against her because she drafted the stipulation.

With respect to the pretrial orders, they were carefully crafted by the judge to accommodate the mother's travel needs, and to control the subsequent conduct of the parties, unless modified at trial to prevent manifest injustice. See *Slade* v. *Slade*, 43 Mass. App. Ct. 376, 380 (1997). Accordingly, once the issues are defined in a final pretrial order, "they ought to be adhered to in the absence of some good and sufficient reason." *Monod* v. *Futura, Inc.*, 415 F.2d 1170, 1173 (10th Cir. 1969).

Here, the mother was hardly in a position to complain, because the judge had ample authority to impose even more drastic sanctions for noncompliance with the pretrial orders than contempt, including refusing to hear from her witnesses and entering a default judgment. See, e.g., *Britt* v. *Rosenberg*, 40 Mass. App. Ct. 552, 554-555 (1996). Given the numerous dilatory and vexatious actions on the part of the mother and her several lawyers (jointly and separately), and their apparent flouting of court orders, we are confident that the judge did not abuse her discretion in finding the mother in contempt.

6. *Sanctions and counsel fees.* After choosing to afford the mother — through counsel — a fair opportunity to defend against the father's modification complaint, the judge decided to impose financial sanctions because of her contemptuous actions. Under G. L. c. 215, § 34, probate courts possess authority to

enforce orders, sentences, judgments, and decrees made or pronounced in the exercise of any jurisdiction vested in them. See generally Kindregan & Inker, Family Law and Practice § 72.1, at 632 (2d ed. 1996).

The judge also ordered the mother to pay to the father's counsel approximately fifty percent of his fees because of her dilatory actions, and for his lawyer's efforts related to the contempt action. We afford much discretion to trial judges in setting counsel fees "if their findings of fact are not clearly erroneous." *Krock* v. *Krock*, 46 Mass. App. Ct. 528, 533 (1999), quoting from *Kennedy* v. *Kennedy*, 23 Mass. App. Ct. 176, 179 (1986), *S.C.*, 400 Mass. 272 (1987). Because the record facially substantiates the fees awarded, there is no need to second-guess that determination.

The father has cross-appealed, and contends that his counsel should have received an award that would fully compensate him. However, the judge found that neither the mother's nor the father's counsel had covered themselves with glory. Specifically, the judge found that "[a]t times, [the lawyers'] conduct was of no assistance in determining the issues at hand and disrupted the judicial process." The degree of civility to which lawyers should aspire was found entirely lacking in this litigation. Even if we were to take an extremely generous view of zealous advocacy, we still would be hard pressed to find anything close to a favorable argument that the judge, who patiently presided over this bitterly contested case, abused her discretion in awarding financial sanctions and only partial attorneys' fees.

*Judgment affirmed.*